[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, James Mulligan, was at all times material to this case the owner of Unit 202A at the Tide Harbor Condominiums. He acquired that unit in 1978 and at the time of the fire there on July 25, 1997, which is the subject of this suit, he had leased those premises to a Mr. Kusel. The fire originated in his unit, caused damage to it and to Units 102A and 302A as well as hallways, porches and stairwells which constituted a portion of the common areas. The defendants are Tide Water Condominium Association, Inc. (Association) and Hub Realty Associates, LLC (Hub), which was the property manager for the Association.
The Association had insurance for this type of loss and it hired the services of Nutmeg Adjusters (Nutmeg) to act as its adjuster. The insurance company's adjuster was Eastland Claim Services (Eastland) and the intention was that between these two entities they would agree upon a figure reflecting the loss to be paid by the carrier. Nutmeg contracted with Tidewater for a fee of seven percent of whatever the carrier agreed to pay.
Through the services of Fred Beitman, a principal of Hub, the Association had chosen North End Builders to do the work to repair the fire damage to the common areas in order to return the premises to their previous condition. Beitman testified he had used North End on several occasions and was happy with their work. Apparently, the unit owners were given the choice of working with North End or they could use their own contractor. The plaintiff chose that option and got three estimates: (1) one from Daley Construction in the amount of $31,851.14; (2) one from CT Page 8226 North End Builders for $20,000; and (3) one from August Builders for $27,198.48. He chose Daley. After the plaintiff was advised that he was only being allowed $24,240.47 for repairs, he renegotiated his price with Daley down to $25,000. He claims this would not totally restore his unit. He was unclear as to why this would result but did give one example that he would now get repainted kitchen cabinets rather than new cabinets.
The plaintiff did request a copy of the Nutmeg appraisal from Beitman, the Association or both and claims he was initially denied it. On November 4, 1997, Mr. Beitman wrote to the plaintiff and enclosed a portion of the appraisal as it applied to the plaintiff's specific loss for a replacement cost in the amount of $24,240.47. In paragraph five of that letter it specifically states that "the Association will have to pay for the independent adjuster and use funds appropriated for overhead and profit to pay for this cost." Although the figures for overhead, profit and sales tax were not included in what was supplied, the clear import of that language was that the Association would utilize those amounts for its own purposes. This so-called non-disclosure would appear to be the basis of the four fraud counts of the complaint.
Thereafter, on November 24, 1997, in another letter from Beitman to Mulligan (plaintiff's exhibit 4), the Association advised the plaintiff that they would immediately send him $19,975.12 representing the actual cash value that the Association had received for damages to his unit and further advised him that an additional $4,852.75 would be available from the insurance carrier after their inspection and verification of monies spent. The letter agreement required the approval of the plaintiff before money would be dispersed and he signed at the bottom of said exhibit that upon payment of that sum "I hereby acknowledge that the Association will have no further liability to me for damages to my unit once the funds above have been received by me." He now claims that he would never have signed this document if he knew the details concerning the sums set aside for overhead, profit and sales tax in the full appraisal. He maintains that even though that very subject was discussed in the November 4, 1997, letter (plaintiff's exhibit 3). From that date to December 3, 1997, when he executed plaintiff's exhibit 4, he never specifically inquired about the funds earmarked for profit and overhead.
On February 2, 1998, the plaintiff wrote to the Board of Directors complaining about the distribution and allocation of the insurance proceeds. In it he details how he believed he has been unfairly dealt with and does his own arithmetic to conclude that he was entitled to an additional $7,771.68 representing his proportional share of the money estimated for profit, overhead and sales tax. He also states in that letter that he will not accept any of the additional funds ($4,852.75) CT Page 8227 which were set aside for his claim.
Thereafter, on February 11, 1998, Mr. Beitman again corresponded with the plaintiff (defendant's exhibit E) advising him that he had received the actual cash value of the repairs to his unit in the amount of $19,975.12 and if he wanted to get the replacement cost amount (the $4,852.75), he would have to submit paid bills and cancelled checks to prove that the work was actually done. The plaintiff admitted on the witness stand that he has never done so, even though he had those items. (See plaintiff's exhibits 11 through 14.) No evidence was offered as to the present whereabouts of that sum, but it is fair to assume it has been retained by the carrier. There is certainly no evidence that it was given to either of the defendants.
In his First Count, the plaintiff claims that Tide Harbor violated Connecticut General Statute § 47-84 (a) which provides:
 Except as hereinafter provided, damage to or destruction of any building or improvement located on the condominium parcel or serving the condominium shall be promptly repaired and restored by the declarant or the association using the proceeds of insurance, if any, on such buildings or improvements for that purpose and all costs for repairs or reconstruction in excess of available insurance proceeds shall be a common expense.
He further argues, on page 2 of his brief, that the Association by permitting the plaintiff to choose his own contractor would incur the cost of that contractor no matter how high it was. He cites no authority for that position, and it is unlikely that any could be found. In simple terms, the Association offered the use of the contractor it was using for common areas to restore the plaintiff's unit for $20,000, well under the $24,240.47 estimate of its adjuster for making the repairs. The plaintiff chose to use his own contractor for a contract price of $25,000. He claims that figure would not do the whole job or fully restore his unit but he has offered no evidence to support that claim.
The underlying fact pattern that is at the basis of all the claims in this case is that the Association acting through its manager Hub Realty falsely represented the amount available to the plaintiff for restoration of his unit by deducting contractor's overhead, contractor's profit and sales tax from the total adjuster's estimate in arriving at the figure of $24,240.47 for the plaintiff's unit. That simply was not the case.
First, the total amount arrived at was only an estimate. Common sense tells us that the Association's adjuster would high ball the figure and CT Page 8228 the insurance company's adjuster would low ball the figure and they would eventually compromise it. Further, the Association, through Hub's representative, Fred Beitman, in a letter to the plaintiff on November 4, 1997 (plaintiff's exhibit 3), made it clear
 "that the association will have to pay for the independent adjuster and use funds appropriated from overhead and profit to pay for this cost."
So there was nothing false in the estimate because it was made clear from the beginning that those amounts for profit, overhead and sales tax were not factored into any individual estimate of repairs but would be used for expenses of the appraiser.
What is clear from this fact pattern is that the Association could have made the repairs and restoration to the plaintiff's unit for less than the estimate of $24,240.47. There is evidence that the Association's contractor, North End Builders, was reputable and the plaintiff offered no evidence to the contrary.
Finally, the plaintiff offered no evidence that his unit was not fully restored or its value diminished because of it. The plaintiff has not proved a violation of § 47-84 (a), and judgment on the First Count will enter on behalf of the defendants.
For all of the same reasons, the court finds that the plaintiff has failed to prove any violation of Connecticut General Statute § 47-278
et seq. based on the same factual allegations as contained in paragraphs one through sixteen of the First Count, and therefore judgment will enter for the defendants on the Second Count.
Counts III and IV against Hub allege Negligent Misrepresentation and Intentional Misrepresentation respectively and Counts V and VI allege these same claims as to Tide Harbor. The factual allegations are the same and as such they reallege paragraphs one through sixteen of the First Count. What is new in these counts is that the plaintiff claims that in plaintiff's exhibit 3, the letter from Beitman to him dated November 4, 1997, Beitman redacted from the overall estimate the exact figure for overhead, profit and sales tax and thus falsely represented the true amount of the insurance proceeds available to the plaintiff. Again, the estimate was just that — an estimate. Further, what the plaintiff continuously fails to mention is that letter very specifically notes that the fees of the adjuster will have to be paid from those funds, and they are not available for distribution to unit owners whose properties have been damaged. There was clearly a disclosure of this fact, and it cannot be the subject of a misrepresentation or nondisclosure whether it is CT Page 8229 negligent or intentional.
If the plaintiff wanted a more specific description of those funds, he should have specifically asked for it, which he did not. If he was unhappy with the estimate or the fact that the moneys set aside for profit, overhead and sales tax were to be used for the expenses of the appraiser, he should not have signed plaintiff's exhibit 4 which set his payment from the insurance proceeds at $24,240.47 which he accepted and acknowledged that upon payment of those funds the Association would have no further liability to him.
Based on the fact that the court finds no misrepresentation, negligent or intentional, to have occurred, judgment will enter for the defendants as to Counts III, IV, V, and VI.
As to Count VII, the CUTPA count, as the court has found no violation of any condominium law or misrepresentation by any of the defendants, that count fails for a lack of factual support, and the court does not opine on the additional claims of the defendant Hub that CUTPA does not apply to their activities as manager of a condominium association.
 ___________________ GORMLEY, J.